# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NORTHERN STAR INDUSTRIES, INC.,**

**Plaintiff-Counterdefendant,**

**v.**                                                              **Case No. 11-C-1103**

**DOUGLAS DYNAMICS LLC,**

**Defendant-Counterclaimant.**

---

# DECISION AND ORDER

---

On January 5, 2012, the Court held an evidentiary hearing on the preliminary injunction motion filed by the Plaintiff, Northern Star Industries, Inc. ("Northern Star"). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Northern Star seeks a preliminary injunction enjoining the Defendant, Douglas Dynamics LLC ("Dynamics"), its direct competitor in the snow plow market, from engaging in false and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a),[1] and requiring corrective advertising.

Having considered the testimony and evidence presented at that hearing as well

---

[1] 11 U.S.C. § 1125 (a)(1)(B) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

as the parties' submissions, including their post hearing briefs, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(2) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Northern Star is a Michigan corporation with its principal place of business in Iron Mountain, Michigan. Northern Star designs, manufactures, and sells snow plows under the "Boss" brand. For more than 20 years Northern Star has sold snow plows under the "Boss" brand name. The Boss reputation in the marketplace is one of durability and reliability, service, quality construction, and safety. The brand caters to professional snowplow contractors who are savvy with respect to product information.

Dynamics is a limited liability company organized under the laws of Delaware with its principal place of business in Milwaukee, Wisconsin. Dynamics manufactures and sells snow plows under the "Fisher" and "Western" brands. Dynamics' "Fisher" and "Western" brand snow plows are direct competitors with the "Boss" brand.

Both companies manufacture trip-blade and trip-edge plows. "Trip-blade" designs rely on the entire blade of the plow moving in the direction of the trip. " Trip-edge" designs rely on the edge of the blade, but not the blade as a whole, moving backwards to facilitate the trip. Each type has its advantages and disadvantages. (*See* Ex. 12.) This action was spurred by a comparative advertising campaign that Dynamics embarked upon that involved print advertisements, Fisher and Western websites, videos and social media such as Facebook.

2

Mark Klossner ("Klossner"), Boss's marketing director, characterized Dynamics' advertising campaign as "a fear campaign which is tied to safety," stating that "there is no more powerful motivator than a fear campaign." (Tr. 81.) Sandra Cashman ("Cashman"), the chief executive officer of Epic Creative ("Epic") an advertising agency in West Bend, Wisconsin and the account manager for Dynamics, indicated that safety is a material part of the consumer purchasing decision and that creating doubts about the safety of a company's product, damages the brand in way that may be impossible to quantify. (Tr. 198.)

To understand the nature of the campaign, a synopsis of how the Boss v-blade operates is necessary. The Boss v-blade is hinged in the middle. The portions to the right and left of the hinge are referred to as wings. A hydraulic cylinder mounted on the back of each wing allows the wing to be positioned independently. The two hydraulic cylinders have the ability to push the blade forward from a "V" position where the wings are back like a fighter jet, to a straight position when the entire blade is parallel to the front portion to the vehicle, and to the scoop position when the wings are both moved full forward. The "V" position is effective for breaking through deep heavy snow. In the scoop position, the blade can push snow without snow rolling over the ends of the snowplow.

Snowplowing, a seasonal activity, is often done in the dark and in bad weather with poor visibility. In addition, snow that is being plowed can hide low profile, hard immobile objects, such as manhole covers and ice-shelves. Since the 1920's, the snow plow

industry has dealt with the hidden immobile object problem with technology intended to cause snowplow blades to "trip" over such objects.

According to Northern Star, "tripping" causes the blade, or the edge of the blade, to rotate backwards so that the plow can clear the object. According to Dynamics, during "tripping" "the edge of the plow rotates about the same axis as the trip function." (Tr. 158 (Barker).) Stated somewhat differently by Cashman, "tripping is when the blade folds forward to get over an obstacle." (Tr. 192.) Cashman testified that when a v-blade is in the V-mode, the two halves of the blade cannot fold forward so that the entire v-blade has to tilt forward and lift over the object. (*See id*.)

Based on its market research and subsequent research, Dynamics became convinced that safety was a key concern of snow plow dealers, operators, and customers. Believing that the trip-edge design is superior from a performance standpoint and safer than the trip-blade design, Dynamics began to explore ways to make use of those characteristics in its promotional efforts.

At the request of Dynamics, Epic developed an advertising campaign which includes videos involving a feature-by-feature comparison of the competing v-plows that is intended to favor Fisher and Western and disfavor Boss. In preparation for the video, Dynamics built a test track in Epic's parking lot. Dynamics' Supervisor of Technical Services, Chad Thomas Barker ("Barker"), inspected the test track to make sure that it met Dynamics specifications. To represent an immoveable object, steel pins that were 12 inches long and about one and a half inches in diameter were inserted into two steel sleeves that were cast into

4

a concrete foundation and placed far enough apart so that each wing of a v-plow configuration would hit one pin. About three inches of the pin were exposed above the asphalt surface. No springs were inserted into the sleeve.

The tests for Dynamics' comparison videos were performed on June 13, 2011. Barker served as the test driver. Barker's prior experience includes performing about 100 obstacle tests involving snow plows, and 13 years of experience as a race car driver both locally and regionally.

Standard Boss Power-V XT, the Fisher XtremeV, and Western MVP Plus snow plows were used in the videos. Three trucks were used in the videos. The same type of truck was not used for the Fisher or Western impact and the Boss impact.[2] Different types of trucks may have different types of suspensions and different parts.

The tests began at five miles per hour and increased at about five mile per hour increments. The tests were done at five, ten and 15 miles per hour. An initial plan to perform the tests at 20 and 25-mile per hour speeds were not carried out because Barker did not want to sustain the bodily impact at those speeds.

Barker measured the speed of the truck when he was performing the tests by looking at the needle of the speedometer. Barker is aware that there is a margin of error for speedometers but he does not know what it is. During the tests, Barker watched for the pins and watched the speedometer. He accelerated to the desired speed and held that speed by applying his foot consistently to the gas pedal as he approached the pins and went across them.

---

[2]However, Barker averred that "extended-cab, three-quarter ton pick-up trucks" were used in the tests. (Barker Aff. ¶ 9.)

5

Barker wore his seat belt during each of the test runs. Barker believes he performed three five mile per hour tests with the Boss v-plow. In some of those tests, the Boss v-plow cleared the pins. (*See* Ex. 1026, 2:11-2; 47; 3:13-3:49; 4:12-4:41). Specifically, the raw footage of the Dynamics video shows the Boss v-plow tripping and clearing obstacles in three out of four tests that Dynamics ran in the scoop and V-mode (once in scoop mode at five miles per hour, once in V-mode at five miles per hour, and once in V-mode at ten miles per hour). (*Id.*)

Dynamics used five cameras to shoot the video including two mini GoPro cameras: one mounted on the rear window of the truck, inside, to the far right pointing over the driver's shoulder and one mounted on the driver's side window pointing at the driver. Five test runs were shot with the Boss v-plow. About the same number of test runs were done with the Fisher and Western plows. Dynamics did not collect any quantitative data from the test runs.

Take one of the video showing the Boss v-plow in straight mode and take two in the scoop mode were used in the comparison video. At the time, the truck was going about five miles per hour. However, the cab shot used in the comparison videos was from either take four or take five, when the truck was going at a faster speed – ten or 15 miles per hour. The cab shot appears twice in the videos – once following the shot of the Boss v-plow in the scoop mode when it does not clear, and once with split screen showing a driver in a Boss truck, and a driver in the Western/Fisher truck. In both instances the cab shot purports to represent the impact on the driver at five miles per hour where the truck did not have enough energy to get over the pegs.

6

In its video, Dynamics did not use footage in the scoop mode at ten and 15 miles per hour when the Boss v-plow cleared the pegs. Dynamics also did not use the footage from the v-mode at ten and 15 miles per hour when the Boss v-plow cleared the pegs. Barker has never seen two pegs sitting in a parking lot. Two pins were used to get a consistent hit across the entire blade by hitting both wings.

The Boss manual directs that the operator should not exceed 14 miles per hour. (Ex. 6 at 7, 26, 60.) It also states that seatbelts should always be used. (*Id.* at 26, 60.)

The Western manual directs that the plowing speed should not exceed ten miles per hour. (Ex. 7 at 9, 11, 79.) The Western manual also direct that operators should wear a seatbelt when plowing snow. (*Id.* at 78.)

If the Fisher/Western trip edge strikes a hidden object that is eight inches or nine inches above the six-inch point, the trip edge will begin to rotate. However, depending on the shape of the obstacle and speed of the plow, the trip edge will not clear because it will hit the moldboard and stop. Therefore, neither the Fisher nor Western trip edge will trip over a hidden obstacle of any height.

Barker would not have driven the truck with the Fisher or Western trip edge into the pins if they had been sticking nine inches out of the ground because it would not have been safe. As manufactured, trip edges are six inches high but they wear and are viewed as a sacrificial part. The less expensive part wears away and is then replaced, instead of replacing the more expensive blade. In most cases, the trip edge wears down to about four inches. A

7

four-inch trip edge blade further reduces the margin of safety for a plow operator who encounters a hidden immovable obstacle.

On or before August 2011, Dynamics began publishing statements comparing the Boss, Fisher, and Western "v-plow" snow plows in a print, web-based and video advertising campaign. Dynamics' advertising campaign consists of (1) four print advertisements – two for Fisher's "XtremeV" snow plow and two for Western's "MVP Plus" snow plow – each of which directs the reader to a Fisher/Western website link; (2) two Fisher/Western websites link pages depicting a Boss plow next to a Fisher/Western plow that also restates some of the substance of the print ads and provides a link to video comparisons of Boss and Western/Fisher plows; and (3) two videos – one comparing the Fisher XtremeV against Northern Star's Boss "Power-V XT" and the other comparing the Western MVP Plus against the Boss Power-V XT. (Ex. 18 (Klossner Decl. ¶¶ 4-15)[3].)

*Print Ads*

One of the Fisher print ads is a photograph of a man with a bloody face holding a piece of raw meat against an eye (*Id*. at ¶ 5, Ex. A), and the other is a photograph of a shattered windshield. (*Id*. at ¶ 6, Ex. B.) Both Fisher print ads state "IF YOUR V-PLOW DOESN'T COME WITH A TRIP EDGE, IT BETTER COME WITH A CRASH HELMET." The image of the man with the bloody face was used as an attention getting device to raise doubts about personal safety. Startling images are used in advertising to get people to stop and

---

[3]The Klossner Declaration was originally filed as Docket No. 6.

read the ads. The bleeding face image was also intended to spur the viewer to take the additional step of watching the video and seeing all the features in comparison.

One of the Western print ads is a photograph of a physician examining two skull x-rays, one of which shows a fracture – the x-ray with the fracture has "Boss" written on it in stylized letters. (*Id*. at ¶ 7, Ex. C). The other Western print ad is an image of a raised manhole cover against black asphalt road and reads "V-Plow Nightmare." (*Id*. at ¶ 8, Ex. D).

Only the skull x-ray ad mentions "Boss." The three other print ads do not mention Northern Star or Boss. The bleeding face, shattered windshield, and skull fracture ads invite the reader to "go to vplowfacts.com to see v-plow crash tests and get the facts." (Exs. 13, 14, 16.) The manhole cover ad states "GET THE FACTS AT V-PLOWTRIP.COM" (Ex. 18 ¶ 8, Ex. D.) The print ads were published in trade magazines read by snow removal professional and landscapers. These magazines have circulations of 5,000 (*Snow Manager*); 24,000 (*Snow Magazine*); 75,000 (*Total Landscape Care*); 30,000 (*Snow Business*); 120,000 (*Snow Pro*). The magazines also have on-line versions.

### *Fisher and Western Websites*

The four print ads reference and provide the website addresses for website link pages and videos that Dynamics posted or caused to be posted on the websites for its Fisher and Western snow plows. The website link pages and videos appeared on the websites www.fisherplows.com/fe/showroom/vplowfacts.php and www.westernplows.com/wp/showroom/vplowtrip.php.

The video that is posted on the Fisher website (the "Fisher Video") is accessed by the link "GET THE FACTS" presented in large font on Fisher's homepage, http://www.fisherplows.com/fe/index.php.  When the viewer clicks the link, a new website link page appears on which "GET THE FACTS" is again displayed in large font along with a link to the video.  The video link page states:

> If your V-plow has a trip blade, you know the story. There you are, plowing along, feeling good, saving the rest of the world from the storm, when BAM you're in the crash zone wondering what the #@!* you hit. That's because when a trip blade hits a hidden obstacle in vee or scoop, it can't trip. And the results aren't pretty.
>
> Good thing FISHER® XtremeV™ V-plow comes with a trip edge, which trips over hidden obstacles in any configuration. It can save you a lot of headaches.

(Ex. 18 ¶ 10.)

Similarly, the website link page and video (the "Western Video") that are posted on the Western website are accessed by the link "TRUTH IN SNOWPLOWING" which is set forth in large font on Western's homepage, http://www.westernplows.com/wp/index.php. Once a viewer clicks this link, a new website link page appears on which "TRUTH IN SNOWPLOWING" reappears.  The video link states that users of Western plows are "protected in every configuration" which is "just what the doctor ordered."  (*Id*. at ¶ 11.)

*Comparison Videos - Boss v-Blade Cannot Trip*

Twice during the Fisher and Western videos, the narrator represents that the videos are "a feature by feature comparison."  The narrator in the Fisher video states that Boss' trip blade "protects your plow and truck, but only when plowing in a straight blade

configuration.  Now, here's what you need to know about a trip blade on a v-plow. When plowing in vee or scoop mode, it cannot trip.  That's because the blade is hinged in the middle" followed by footage of the Boss v-plow tripping but not clearing steel pegs.  (Ex. 18 ¶ 13, Ex. F (Fisher Video posted as of 12/1/11) 1:41.)  Similarly, the narrator in the Western video states that Boss' trip blade "protects your plow and truck, but only when plowing in a straight blade configuration.  Now, here's what you need to know about a trip blade on a v-plow.  When plowing in vee or in scoop mode, it cannot trip.  That's because the blade is hinged in the middle" followed by footage of the Boss v-plow tripping but not clearing steel pegs.  (*Id*. at ¶ 12,  Ex. E (Western Video posted as of 12/1/11) 1:25.)

*Comparison Videos - Safety*

The narrator in the Fisher video states " [a]ll Fisher v-plows, however, feature trip edge protection. When you hit that obstacle in any plowing configuration, the edge is free to trip.  So, you get safely over bumps and obstacles, whether plowing in vee, scoop or straight blade configuration." (Ex. 18 ¶ 13, Ex. F 2:18.)  (*See also id*. at ¶ 12, Ex. E ("All Western v-plows, however, feature trip edge protection. When you hit that obstacle in any plowing configuration, the edge is free to trip.  So you get safely over bumps and obstacles, whether plowing in vee, scoop or straight blade configurations.")

With respect to safety the Fisher video also states "trip edge protection in all positions versus trip blade protection in straight mode only" combined with footage of Boss plow tripping but not clearing steel pegs.  (Ex. 18 ¶ 13, Ex. F  8:05.)  Likewise the Western

video states "trip edge protection in any position versus trip blade protection in straight mode only . . ." combined with footage of Boss plow tripping but not clearing steel pegs. (*Id.* at ¶ 12, Ex. E 8:31.)

*Northern Star's Response*

Northern Star sent a cease and desist letter to Dynamics on September 30, 2011. (McCarthy Aff. ¶ 2, Ex. A.)[4] The letter stated:

> You must immediately cease and desist from any false, deceptive or misleading claims, statements, assertions or representations – whether explicit or implicit – regarding the Fisher, Western and Boss Snow Plows. You also must immediately remove all such claims from all of your promotional materials, whether in written, electronic, verbal, visual or audio form, including, but not limited to, advertisements, brochures, emails, website materials, Facebook, YouTube, press releases, announcements and correspondence. You must also immediately begin a corrective advertising campaign to correct the false, deceptive and misleading claims and statements the above ads have created.
>
> **If you do not take this requested action within two business days, Northern Star will have no choice but to pursue all available legal remedies against you.** Northern Star also reserves all rights with respect to your unlawful conduct thus far.

(*Id.*, Ex. A, 7.) (Emphasis added.)

In response, on October 21, 2011, Dynamics agreed not to seek further production of its print advertisements after the September 30, 2011, date of Northern Star's letter. Dynamics also edited the videos that it had posted on its Fisher and Western websites to delete the narrator's statements "Ouch!" and "the trip blade provides no protection to your plow, your truck, and most importantly, you." However, versions of the Fisher and Western

---

[4]The McCarthy Affidavit was filed as Docket No. 8.

12

videos first published on Dynamics' websites remain on Fisher and Western dealer websites and other media postings.[5] (Ex. 18 ¶ 19, Ex. K.) By a letter dated October 21, 2011, setting forth Dynamics' position, Dynamics also references a phone conversation of the preceding week and "discussions in the interim." (McCarthy Aff. ¶ 3, Ex. B, 1.)

On November 10, 2011, Northern Star wrote Dynamics a 20-page letter – eight of the pages address Dynamics' advertising campaign. (*Id.* at ¶ 4, Ex. C.) The closing paragraph of the letter states:

> As discussed in our earlier conversations and referenced again above, we too of course would rather not pursue litigation, but your client's unwillingness to immediately cease its entire false and misleading ad campaigns could leave us with no choice. If your client is interested in further remediation (other than simply not seeking further publication in magazines of the bloody face, fractured skull and cracked windshield ads), please do contact me.

(*Id.*, Ex. C, 21.)

From August through November 2011, the print advertisements appeared in multiple trade publications that are circulated throughout states in this country where snow falls. (*Id.* at ¶ 16.) All the print ads have completed their runs. However, the magazines in which they were placed remain on counters, tables and waiting rooms. Most of the magazines can also be found on-line. The videos are also spread virally by means of *Facebook*. When an individual visiting Fisher or Western's website posts that he or she "likes" the video, that "like" then goes out to their network of friends, and so on.

---

[5]Although Northern Star also states that the *original* versions of the video are on Fisher and Western's "Facebook" pages citing paragraph 18 of the Klossner Declaration, the cited paragraph states the current videos are on those websites.

13

On December 23, 2011, a Boss customer, Christopher, who had recently purchased a Boss Power V XT plow contacted Boss because he was "very worried" about a video he had seen showing that the plow did not trip in the v-mode or the scoop mode. He did not want to "damage [his] truck or possibl[y] get injured." (Ex. 20.) Dealers have also posted the Fisher and Western videos on their websites.

The prime season for retail sales of snow plows runs from no earlier than September of a given year through no later than January of the following year. (*Id.* at ¶ 19.) By sometime in January of a given season, any retail sales that are going to be lost (for any reason) will have been lost — and most of those sales will have been lost by the end of December. (*Id.*)

*Northern Star's Videos*

Under the supervision of Jody Christy ("Christy"), Northern Star's engineering manager who has a bachelor's degree in mechanical engineering from Michigan Tech University, Northern Star performed its own tests at the factory on its Boss test track in an attempt to replicate the Dynamics videos. The only information Northern Star had was from the videos. Northern Star did not request any other information about the tests from Dynamics.

Northern Star used its normal test truck a 2003 F-250, extended cab, short box, four wheel drive truck. The pins used in the Northern Star tests were eight inches long, set about six inches deep into the ground in steel sleeves embedded in concrete. The pins protruded about 2.5 inches from the ground and were placed on springs to avoid tire punctures.

14

A load cell weighing 20 pounds was placed on the truck. Christy testified that neither the springs under the pins nor the load cell had any effect on tripping.

Northern Star contracted with consultant Jeff Gwaltney ("Gwaltney"), senior research engineer at the Keweenaw Research Center, to obtain access to its high speed imaging capabilities and speed sensors. The test was recorded using a Photron Fastcam, a high speed imaging device. The truck speed was measured by using a Racelogic Speed Sensor that uses Doppler shift frequency to be able to determine velocity. The sensor was calibrated and certified, and is rated at better than one-tenth of a mile accuracy. At 15, ten, five, three, and two miles per hour, the Boss v-blade in the scoop position (tests one, two, four, six, and eight, respectively) tripped and overcame the pins. (Ex. 9 (Christy Decl. Ex. A). ) At ten, five, and three miles per hour (tests three, five, seven, respectively), the Boss v-blade in the v-mode, rotated, tripped and cleared the pins.

Northern Star also performed two runs each shown as a picture within a picture screen, at ten miles per hour (test nine) and seven miles per hour (test ten) with the v-plow in the scoop position. During one of the tests one of the pins came out of the ground.

Northern Star graphed the data that it obtained from a spring potentiometer during the seven miles per hour test (determined to be 6.7 actual miles per hours) scoop mode. At the point of maximum rotation when the blade was clearing the obstacle the speed was five miles per hour, and continued to the final portion of the test as the truck coasted down to 4.9 miles per hour. (Ex. 11, 1.) Maximum spring extension occurred at two-tenths of a second. (*Id.*)

15

Northern Star also graphed the data that it obtained at five miles per hour in the v-mode. The initial vehicle speed was measured at 5.1 miles per hour and after hitting the pins the maximum extension occurred at .2 seconds when the speed slowed about one mile per hour during the course of tripping.

Northern Star conducted test videos with manhole covers on its test track in the ordinary course of business that are unrelated to this action. Those tests show the Boss v-plow in the scoop mode, hitting the manhole cover in the center, tripping, and clearing the cover. Also shown is the Boss v-plow in the scoop mode hitting the manhole cover, and tripping and clearing the cover.

*Post-Hearing Actions*

As of January 19, 2012, Dynamics had removed from its website and its Facebook page all access to the print advertisements challenged by Northern Star. Dynamics has no intention of circulating this material in any form in the future.

On January 19, 2012, Dynamics also informed the Court that in light of information that came to light at the hearing, for example, the fact that the cab-shot shown on the split-screen with the BOSS plow test run was not the cab-shot taken on that run, Dynamics was examining its "feature by feature comparison" web videos, and if Dynamics decided to make any changes in the web video, it would advise the Court promptly.

During the late afternoon of January 24, 2012, Dynamics filed a report advising the Court that it had changed the web advertisements for both the Fisher and Western lines to (among other things) include raw footage of more of the plow tests that it ran and to insure that

16

any cab-shot shown on the web advertisements in split-screen matches up with the corresponding test-run. Accompanying that report is a video disc showing the modified videos. Subject to any contrary order of the Court, Dynamics intends to post the revised web advertisements on the appropriate websites on Monday, January 30, 2012, to replace the web advertisements that are currently running.

In the early evening of January 25, 2012, Northern Star responded to the proposed revised videos. Without going into detail, it states that the proposed revised videos have additional legal deficiencies that will be explained in subsequent legal proceedings. Northern Star also maintains that the proposed revised videos do not cure the past and ongoing damage to the Boss brand and reputation.

## APPLICABLE LAW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify a preliminary injunction, Northern Star must show that it is likely to succeed on the merits of its claims, that it is likely to suffer irreparable harm without an injunction, that the harm that it would suffer without an injunction is greater than the harm that preliminary relief would inflict upon Dynamics and that the injunction is in the public interest. *See Michigan v. U.S. Army Corps of Engrs.*, No. 10-3891, ___ F.3d ___ , 2011 WL 3836457, at * 2 (7th Cir. Aug. 24, 2011), *pet. for cert. filed*, ___ U.S. ___, 80 BNA USLW 3283 (U.S. Oct. 26, 2011) (No. 11-541).

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit, while the likelihood of irreparable harm takes into account how

urgent the need for equitable relief really is." *Id*. at *22. These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). In considering irreparable harm, the question is whether the party seeking relief will suffer irreparable harm in the interim period prior to the resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am. Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

As explained in *United States Army Corps of Engineers*, No. 10-3891, 2011 WL 3836457, at * 22:

> For preliminary relief to be granted, the irreparable harm must also be likely. That is, there must be more than a mere possibility that the harm will come to pass, *Winter*, 555 U.S. at 21–23, 129 S.Ct. 365, but the alleged harm need not be occurring or be certain to occur before a court may grant relief, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952); *Bath Indus., Inc. v. Blot*, 427 F.2d 97, 111 (7th Cir.1970). Commentators describe the required level of certainty this way: "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown. However, the injury need not have been inflicted when application is made or be certain to occur." 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2948.1, at 154–55 (2d ed. 1995).

It is well established that false or misleading commercial speech may be prohibited entirely. *See In re R.M.J.*, 455 U.S. 191, 203 (1982); *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009). In order to establish a claim of false or misleading advertising under § 43(a) a plaintiff must prove: (1) a false statement of fact by the defendant in a

18

commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.  *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999).

The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  To show literal falsity, a plaintiff must either show that the defendant's test does not prove the proposition or offer affirmative proof that the advertisement is false.  *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1091 (7th Cir. 1994) ("If the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that those tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false.").

When the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so.  *Id*.  In contrast, when the statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion.  *Id.*

19

## ANALYSIS

Northern Star maintains that Dynamics makes three advertising claims that are literally false, and, even if they are not literally false, they are misleading. The Court evaluates each of Northern Star's contentions separately.

*Claim One: The Boss Power V-XT V-Blade Cannot Trip in the "V" or Scoop Mode*

Northern Star states that Dynamics' print and video advertisements falsely state that Boss' trip-blade v-plows "can't" or "cannot trip" when positioned in "V" or "scoop" mode. (Pl.'s Post-Evidentiary Hr'g Br. 2 citing Ex. 18 (Ex. E at 1:25; Ex. F at 1:41; Ex. G at 1:25; Ex. H at 1:41).) These statements are clearly made in the videos.

However, Dynamics' raw video confirms that the Boss plow can and does trip and clear obstacles in those positions. (*See* Ex. 1026 at 2:11-2; 47; 3:13-3:49; 4:12-4:41). Specifically, the Dynamics raw video shows the Boss v-plow tripping and clearing obstacles in three out of four tests that Dynamics ran in the scoop and V-mode (once in scoop mode at a five miles per hour, once in V-mode at five miles per hour, and once in V-mode at ten miles per hours). (*Id.*) Northern Star's videos also depict the Boss plow tripping and clearing the obstacles in scoop and V-mode at speeds of five, seven, ten and 15 miles per hour. (Ex. 9 at 0:19, 0:38, 0:47, 1:00, 1:16, 1:51, 2:34, 2:53).

Barker, the Dynamics driver, admitted that when he operated the Boss plow in scoop and V-mode at speeds of ten and 15 miles per hour the plow cleared the obstacles. (Tr. 157). Christy, the Northern Star engineer who oversaw Northern Star's testing and videos, observed the Boss v-plow trip and clear obstacles in the scoop and V-mode at speeds of five,

Case 2:11-cv-01103-RTR   Filed 01/26/12   Page 20 of 32   Document 38

ten and fifteen miles per hour and seven miles per hour in scoop mode. (*Id*. at 22-32).

Although in its briefs, Dynamics attempts to qualify its statements regarding tripping, the statements in the videos are unqualified. Dynamics' contentions are also refuted by the raw video footage taken by Epic, and Barker's concessions that the raw video shows the v-blade tripping.

Northern Star has also called into question the reliability of Dynamics' test methodology, which includes measuring speed with a speedometer without any type of calibration or verification. In addition, Dynamics' use of three different truck models – although of a similar vehicle class – raises questions about the reliability of the comparison tests. Comparison tests should be as similar as possible with as many variables controlled as possible, and the variables in Dynamics' tests are not well controlled.

Although Dynamics raises challenges to Northern Star's attempt to duplicate the Dynamics' tests based on the presence of the load cell and the daylight visible under the blade, the only evidence presented is that they made no difference. While the pins used in the Northern Star test and the Dynamics tests were placed into the ground differently, with springs under the Northern Star pins, exactly how that fact affected the Northern Star tests was not established. Nonetheless, the methodology of the Northern Star tests – including oversight by an outside entity – appears superior to that of Dynamics. Northern Star's unrelated manhole video also demonstrates the ability of the Boss v-blade to trip in the V and the scoop mode.

Northern Star has met its burden of showing that the assertion in the video that the Boss Power V-XT v-blade cannot trip in the V or scoop mode is literally false. Consequently, Northern Star need not present actual evidence of consumer confusion. Northern Star has also established that the deception is material and that Dynamics caused its false statement to enter interstate commerce. Northern Star did not present any evidence of direct diversion of sales from itself to Dynamics. However, Klossner and Cashman provided testimony establishing that Northern Star is likely to be injured as a result of the false statement that the Boss Power V-XT V-blade cannot trip in the "V" or scoop mode by a loss of goodwill associated with its products.

*Claim Two: Users of Boss' Trip-Blade V-Plow Will Be Physically Injured but Users of Fisher and Western Plows Will Not Be Physically Injured.*

Northern Star also maintains that the advertising campaign falsely claims that users of the Boss' trip-blade v-plow will be physically injured but users of Fisher and Western trip-edge plows will not. In its post-hearing brief, Northern Star contends that Dynamics repeatedly suggests that its ad campaign provides crucial safety information – which is false. Regardless of the truth or falsity of the proposition, Northern Star is not trying to enjoin that statement – rather it is the false comparison between the purported disparate risk of injury depending on whether plows with the Boss trip-blade v-plow versus the Fisher/Western trip-edge v-plow are used.

Northern Star also maintains that Dynamics unequivocally states when using a Boss v-plow, you "BETTER HAVE A CRASH HELMET," "you're in the crash zone," "you'll experience bone-jarring, windshield banging, steering wheel smacking wake-up calls with

22

every obstacle you encounter," "the results aren't pretty," "[y]ou know the story," the blade "cannot trip," and the trip blade provides "no protection." (Pl.'s Post-Evidentiary Hr'g Br. 11.) However, those statements are drawn from both print ads – which are no longer running – and the videos. They are not helpful for determining what statements are claimed to be a false statement of fact.

The statements "you're in the crash zone," "the results aren't pretty" and "You know the story," the blade "cannot trip," appear on the Fisher/Western web sites and are literally false. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992). Northern Star has not received a single complaint or claim contending that any of the Boss v-plow failed to trip which caused a personal injury. The evidence presented by Dynamics regarding injuries sustained through use of the Boss v-plow is anecdotal or lacks sufficient reliability. Cashman's recitation of the March 2011, interview when the interviewee related that he got a "knot" in his head using the Boss v-plow, lacks sufficient detail to support the strong claim that Boss v-plow users will sustain personal injury. Dynamics also relies on postings on plowsite.com. (Ex. 1001.) While the Court is aware that district courts may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits would produce, *see Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010), the plowsite.com postings are given little weight because, among other things, there is no indication that they are authentic postings of disinterested plow users.

Consequently, Northern Star need not present actual evidence of consumer confusion. Northern Star has also established that the deception is material and that Dynamics

caused its false statement to enter interstate commerce. Northern Star did not present any evidence of direct diversion of sales from itself to Dynamics, but the credible testimony of Klossner and Cashman established injury through the loss of goodwill because of the false statements to the effect that users of Boss' trip-blade v-plow will be physically injured but users of Fisher and Western Plows will not.

*Claim Three: Fisher and Western Plows Safely Trip*
*Over Obstacles in Any Configuration*

The third claim made by Dynamics that Northern Star indicates is false is that Fisher and Western plows safely trip over obstacles in any configuration. Northern Star has presented evidence that establishes that there are situations when the Fisher and Western trip-edge plow will not trip. However, Northern Star has not shown that the failure to trip has to do with the blade configuration. Rather, the failure to trip is due to the height of the obstacle and/or the wear of the trip edge.

This safety claim that the Fisher and Western v-plows trip over objects in any configuration is not literally false or ambiguous. However, it conveys a false impression or is misleading in context that its trip-edge v-plows will trip over any obstacle. *See Abbott Labs.,* 971 F.2d at 13. Since the statement is not literally false, this Court may find that it is impliedly misleading only if presented with evidence of actual consumer deception. *Id.* at 14. Northern Star has not presented any evidence of actual consumer deception based on the false impression created by Dynamics that its Fisher and Western trip-edge v-plows trip in any situation. Thus, Northern Star has not established that it is likely to succeed on third claim under the Lanham Act.

In sum, Northern Star has established that it is likely to succeed on the merits on its first two claims, with the first claim of literal falsity being the strongest.

*Irreparable Harm and Balancing*

In order to obtain injunctive relief, Northern Star must also demonstrate that it has no adequate remedy at law and as a result, will suffer irreparable harm. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002)).

Northern Star maintains that the Court of Appeals for the Seventh Circuit has recognized a presumption that injuries arising from violations of the Lanham Act are irreparable, even absent a showing of business loss. (Pl.'s Br. 25 (citing *Abbott Labs.*, 971 F.2d at 18; *Promatek Indus., Ltd.*, 300 F.3d at 813). Dynamics contends that Northern Star has presented no admissible evidence of irreparable harm that is threatened before trial, nor any injury that could not be repaired by legal remedies.

It is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss. *See Abbott Labs.*, 971 F.2d at 16. This presumption, it appears, is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations. *Id.*

In *Abbott Laboratories*, the court held that "[t]here can be no doubt that Mead's Ricelyte campaign, which attempts to convince consumers that Pedialyte is an inferior OES product, has dented Abbott's reputation." *Id.* (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (comparative advertising "necessarily diminishes [the

competing product's] value in the minds of the consumer")). Because Northern Star has established that it is likely to establish that two of Dynamics' claims are literally false, the Court presumes irreparable harm.

Despite this presumption, Dynamics counters that Northern Star did not act quickly to do anything about Dynamics' advertising campaign. Delay in pursuing injunctive relief may raise questions regarding a plaintiff's claim that it will face irreparable harm if a preliminary injunction is not entered. *See Ty, Inc. v. The Jones Group*, 237 F.3d 891, 903 (7th Cir. 2001); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979).

Northern Star may have become aware of Dynamics campaign as early as July 18, 2011. (*See* Klossner Decl. Ex. Q.) However, Northern Star did not contact Dynamics until September 30, 2011, when it wrote the cease and desist letter to Dynamics. That letter gave Dynamics two days – until October 2, 2011 – to stop using the print ads and internet videos or face an immediate lawsuit. Despite the short deadline, Northern Star did nothing when Dynamics took no action and the deadline passed.

Dynamics finally responded to Northern Star's letter on October 21, 2011, and while agreeing to some concessions, certainly did not accede to all of Northern Star's demands. Northern Star waited an additional 20 days until responding to Dynamics' position. Then, nearly a month later Northern Star filed this action seeking preliminary injunctive relief. While some of the delay may have been attributable to settlement negotiations and the complexity of the issues presented, there is some authority stating that the delay "undercuts

the sense of urgency that ordinarily accompanies a motion for preliminary relief." *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985).

Several district court decisions view a plaintiff's delay in requesting injunctive relief negatively. *See*, *Johnson Publ'g, Co., Inc. v. Willitts Designs Int'l, Inc.*, No. 98 C 2653, 1998 WL 341618, at * 8 (N.D. Ill. June 22, 1998) (presumption of irreparable harm weak where the plaintiff waited four months to file its motion for preliminary injunction); *Stokley-Van Camp, Inc. v. Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300, at * 3 (N.D. Ill. Jan. 30, 1987) (denying "extraordinary remedy" of preliminary injunction despite presumption of irreparable harm because the plaintiff waited three months before filing action and the defendant was spending substantial amounts to market its product); *Borden, Inc. v. Kraft, Inc.*, No. 84 C 5285, 1984 WL 1458, at * 17 (N.D. Ill. Sept. 28, 1984) (stating plaintiff's delay of almost six months before bringing action indicated no irreparable harm).

In *Ty, Inc.*, 237 F.3d at 903, the court stated "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered," citing *Ideal Industries, Inc.*, 612 F.2d at 1025. However, the court further stated that "whether the defendant has been 'lulled into a false sense of security or had acted in reliance on the plaintiff's delay' influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not." *Id*. In this instance, Dynamics has presented no affirmative evidence that Northern Star's delay in seeking a preliminary injunction caused Dynamics to be lulled into a false sense of security or that Dynamics in any way relied on Northern Star's delay. *See*

*id.* Therefore, mere evidence of delay without any explanation on Dynamics' part of why such a delay negatively affected it, would not lessen Northern Star's claim of irreparable injury. *See id.*

Given the presumption of irreparable harm and Dynamics' failure to rebut that presumption, the Court need not address Northern Star's additional reasons offered to suggest irreparable harm; i.e., website postings and comments received by its dealers, etc., . . . or its reliance on *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010) and *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F.Supp. 470, 477 (S.D.N.Y. 1998).

The remaining two considerations are whether the harm that Northern Star would suffer without an injunction is greater than the harm that preliminary relief would inflict upon the Dynamics and that the injunction is in the public interest. In its initial brief, Dynamics contends that it would be harmed by injunction because the key aspects of a marketing campaign that has been under way for months would be disrupted, and abrupt termination will inevitably cause confusion. (Def.'s Br. 26.) However, this Court has concluded that Northern Star is likely to succeed in proving that two claims promoted by that campaign are false. The harm to Northern Star exceeds any harm to Dynamics. Moreover, the public interest favors the injunction because enforcement of the false advertising protection of the Lanham Act protects consumers from confusion.

*Remaining Issues*

There are several issues that must still be addressed. Northern Star seeks a preliminary injunction requiring (a) Dynamics to immediately cease its entire false and misleading ad campaign by removing the false, misleading and deceptive print, video and web-based advertisements from the Fisher and Western websites, and from any other print or web-based advertising or promotional materials; (b) requiring Douglas Dynamics to publish corrective advertising through publication of advertisements (in quantities and formats deemed appropriate by the Court) which repudiate and correct the false and misleading statements in Dynamics' print and video advertisements; (c) prohibiting Douglas Dynamics from directly or indirectly engaging in any further publication of the false, misleading or deceptive statements regarding Northern Star's Boss snow plows or Dynamics' Fisher and Western snow plows, including without limitation through the transmission of emails, the posting of web-based comments, the publication of advertisements or websites, or any other form of mass communication; and (d) requiring Dynamics, within ten days after service on it of the preliminary injunction order to be issued by this Court, to file with the Court and to serve upon Northern Star a report in writing and under oath setting forth in detail the manner and form in which Dynamics has complied with the preliminary injunction.

Dynamics contends that the sweeping injunction requested by Northern Star enjoining its entire campaign and requiring the corrective advertising that Northern Star has requested would not be justified at this juncture.

29

Northern Star has not presented evidence establishing that Dynamics entire 2011 advertising campaign should be enjoined. Portions of Dynamics web site videos and its website have not been challenged by Northern Star. Dynamics also intends to replace the Fisher and Western videos that were on its websites as of December 1, 2011, with newly revised versions that were filed on January 24, 2011. Northern Star indicates that there are additional legal deficiencies it those revised videos. The Court will allow Northern Star an opportunity to address whether additional editing will be necessary.

With respect to Northern Star's request that the preliminary injunction require Dynamics to engage in corrective advertising, such a remedy was encouraged in *Abbott Laboratories*, 971 F.2d at 18. The court of appeals stated "such relief would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act." *Id*. (citing *Wojnarowicz v. Am. Family Ass'n*, 745 F.Supp. 130, 141 (S.D.N.Y. 1990)). In this instance, given the saliency of the safety-related message represented by Dynamics' advertising campaign and the misleading nature of that campaign, corrective advertising becomes a key component of preliminary injunctive relief and will serve the public interest.

With the exception of part (d), the preliminary injunction requested by Northern Star in its initial motion is not sufficiently specific. The injunction must comply with Fed.R.Civ.P. 65(d), which provides that "every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."

30

*Hispanics United of DuPage Cnty. v. Vill. of Addison*, 248 F.3d 617, 619-21 (7th Cir. 2001). *See also, Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010); *United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 739 (7th Cir. 2009). "The aims of Rule 65(d) are to minimize the occasion for follow-on proceedings to the issuance of an injunction and to protect defendants from being held in contempt for failure to follow a directive that was a trap because of its ambiguity." *Apex Oil Co., Inc.*, 579 F.3d at 739-40.

Northern Star's January 25, 2012, brief provides some greater specificity regarding the preliminary injunctive relief sought. However, Northern Star must draft a revised proposed preliminary injunction order and then submit it to Dynamics. Any agreed proposed preliminary injunction must be filed no later than February 10, 2012. If the parties are unable agree on the terms of the preliminary injunction by February 10, 2012, the Court will require Northern Star to file its revised proposed preliminary injunction and Dynamics to file its objections. The Court will also require expedited submissions on the amount of the bond that is required for issuance of an injunction.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Northern Star's motion for a preliminary injunction is **GRANTED TO FOLLOWING EXTENT:**

Northern Star **MUST** draft a revised proposed preliminary injunction order consistent with this Court's Decision and Order and then submit it to Dynamics. Any agreed proposed preliminary injunction must be filed no later than **February 10, 2012.**

31

If the parties are unable agree on the terms of the preliminary injunction by **February 10, 2012**, the Court will require Northern Star to file its revised proposed preliminary injunction order and Dynamics to file its objections to that proposed order on that date.

The Court will also require expedited submissions on the amount of bond. Dynamics must file its brief statement on the amount of the bond **no later than February 1, 2012.**

Northern Star must file any brief response to the amount of the bond **no later than February 9, 2012.**

Dated at Milwaukee, Wisconsin, this 26th day of January, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**